UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
In re:                                          :
                                                :
T.A.T. PROPERTY, A REAL ESTATE                  :        Chapter 11
GRANTOR TRUST,                                  :        Case No. 05-47223(SMB)
                                                :
                        Debtor.                 :
------------------------------------------------------------X

## CONFIRMATION HEARING FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Attorneys for Debtor and Debtor-In-Possession
425 Park Avenue
New York, New York 10022

> Barton Nachamie, Esq.
> Alex Spizz, Esq.
> Jill L. Makower, Esq.
> > Of Counsel

HERRICK, FEINSTEIN LLP
Attorneys for LBCMT 1998-C4 Executive Drive,
        LLC, successor-in-interest to LaSalle Bank
        National Association (f/k/a LaSalle National
        Bank), as Trustee for the Registered Holders
        of LB Commercial Mortgage Trust
        Commercial Mortgage Pass-Through
        Certificates, Series 1998-C4
2 Park Avenue
New York, New York 10016-9301

> Andrew C. Gold, Esq.
> Frederick E. Schmidt, Jr., Esq.
> > Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The debtor seeks to confirm the <u>Debtor's First Modified Fifth Amended Plan Of Reorganization Dated May 8, 2008</u> (the "Plan")(ECF Doc. # 263.)[1]  The application was contested by the debtor's mortgagee, and the Court conducted an eight-day evidentiary hearing.[2]  Although the opposition raised several challenges, the evidence showed that the Plan is patently unfeasible.  Accordingly, confirmation is denied, and the pending motion to dismiss the case with prejudice is granted.  In addition, the pending adversary proceeding commenced by the state court receiver against the debtor and a former tenant will also be dismissed.

---

[1]    The debtor amended its plan after the confirmation hearing began.  The Plan refers to the amendment.

[2]    One of the original transcripts omitted testimony and had to be re-transcribed.  This affected the pagination of several later transcripts.  As different versions of these transcripts have been filed, the record needs to be clarified.  The entire trial took place during 2008, and the date of each hearing and the docket number (noted parenthetically) where the correct transcript may be found is as follows:  April 30 (287); May 2 (288); May 13 (318); May 14 (317); May 28 (316); May 29 (315); June 16 (280) and October 29 (293).  The eight volumes were numbered sequentially, and this opinion refers to the transcript (without regard to date or volume) as "Tr." followed by the page number.

## BACKGROUND

The debtor is a New York real estate grantor trust.[3]   (See Stipulation of Non-Disputed Facts and List of Documents Which the Parties Agree Are Admissible Into Evidence In Connection With Confirmation Hearing on Debtor's Plan, dated Apr.29, 2008 ("Stipulation"), at ¶ 1)(ECF Doc. # 258.)  Michael Zenobio, Jr. ("Zenobio") is the trustee of the debtor and holds 99.98% of the debtor's beneficial interests.   (Id., at ¶ 6.) The debtor owns real property located at 45 Executive Drive, Plainview, New York (the "Property"), (id., at ¶ 2), which is improved with a commercial office building (the "Building").  (Id., at ¶ 3.)

The Building is substantially vacant.  When the confirmation hearing began, there were only two rent-paying tenants.  School Specialty, Inc. ("School Specialty") occupied approximately 12,000 square feet (17.78% of the Building) at a monthly base rent of $24,718.35.  (Id., at ¶ 5.)  The School Specialty lease was deemed rejected, effective June

---

[3]      The mortgagee contended that the debtor is not a "business trust," and hence, is not eligible to be a bankruptcy debtor.  See In re Secured Equip. Trust of Eastern Air Lines, Inc., 38 F.3d 86, 89 (2d Cir. 1994).  A "business trust," as opposed to a non-business trust, has the attributes of a corporation.  Id.  It is created for the purpose of carrying on some type of business.  Id.  Furthermore, although a profit motive is not an absolute requirement, a trust established to generate a profit for its investors is more likely to be considered a "business trust." Id. at 90.

I conclude that the debtor is a "business trust," and is therefore eligible for bankruptcy.  According to the relevant trust document, the debtor was established to "acquire, hold and lease" the property that is the subject of this bankruptcy case for the benefit of the shareholders of the grantor, Abcon Associates, Inc. ("Abcon").  (See Debtor's Response In Opposition To LNR Partners, Inc.'s Objection To Confirmation On §109(a) Grounds, dated May 9, 2008, Ex. A, at 1) (ECF Doc. # 261.)  The trustee is authorized to distribute the net cash flow he receives, subject to the creation of a reserve for current operating expenses and capital improvements.  (Id., at 2.)  It is plain from the documents and the testimony of Michael Zenobio, the trustee and principal beneficiary, that the Property has been operated to generate a profit.

The Bank has identified two aspects of the debtor that distinguish it from corporations.  First, the trust agreement prohibits a beneficiary from transferring his interest without the consent of the majority of the beneficial interests.  (Id., at 3.)  In response, I note that restrictions on the transfer of shares, particularly in the case of close corporations, are also common.  Second, the trust is not perpetual, and has an outside termination date.  (See id. at 7.)  The termination provision appears, however, to be dictated by the requirements of the Rule Against Perpetuities, see N.Y. EST. POWERS & TRUSTS § 9-1.1 (2009), rather than to distinguish the debtor's business or purpose from what it might otherwise be if the debtor were instead a corporation.

30, 2008.  (See Letter from Carla O. Andres to the Court, dated July 8, 2008)(ECF Doc. #

274.)  Its subtenant, AIM Education, Inc. continued to pay the rent, and indicated that it

intended to remain on a month- to- month basis until at least December 31, 2008.  (Letter

from Jill L. Makower to the Court, dated Oct. 8, 2008)(ECF Doc. # 286.)  The record

does not reflect whether it still occupies the leased premises or pays the rent.  The other

rent paying tenant, The Halland Companies, LLC, occupies approximately 6,118 square

feet of the Building at a current monthly base rent of $15,617.79.  (Stipulation, at ¶ 5).  In

addition, the debtor and certain affiliates occupy 7,559 square feet, but currently pay no

rent or use and occupancy.  (See id., at ¶ 7.)

## A.      The Mortgage and the Foreclosure Proceedings

On or about September 9, 1998, the predecessor of LaSalle National Bank

Association ("LaSalle") made a loan to the debtor in the principal sum of $6,725,000.00.

(Id., at ¶ 10.)  The loan was guaranteed by Zenobio, (Id., at ¶ 15), and secured by a first

mortgage on the Property.  (Id., at ¶ 10.)  LaSalle's mortgage matured on October 1,

2008.  (Id., at ¶ 12.)  LaSalle also had a security interest in certain other property of the

Debtor, including pre-petition and post-petition rents.  (Id., at ¶ 34.)

After the debtor filed this case on October 14, 2005, LaSalle assigned its

mortgage to LBCMT 1998-C4 Executive Drive, LLC ("LLC").  (Id., at ¶ 13.)  LNR

Partners has served as the special servicer for LaSalle and LLC.  (Id., at ¶ 14.)  Unless

otherwise indicated, LaSalle, LLC and LNR are referred to collectively as the "Bank."

Beginning in 2003, the debtor stopped making payments on account of the

mortgage and real estate taxes.  (Id., at ¶¶ 17, 20.)  On January 14, 2004, the Bank

accelerated the debt and commenced a mortgage foreclosure action in the Nassau County

Supreme Court.  (<u>Id.</u>, at ¶ 21.)  In May 2004, the state court appointed a receiver of rents,

Arthur J. Kremer (the "Receiver"), to operate and manage the Property.  (<u>Id.</u>, at ¶ 22.)

Since the Receiver's appointment, he and his agents have been charged with managing

the Property, and the Debtor has neither collected rents nor managed the Property.  (<u>Id.</u>,

at ¶ 23.)

In April 2005, the Receiver commenced a holdover proceeding against certain

Zenobio affiliates that were occupying the Property.  (<u>See id.</u>, at ¶ 27.)  The holdover

proceeding was settled by stipulation of settlement dated September 29, 2005, which was

incorporated into a judgment, dated October 5, 2005.  The judgment was, in part, a

money judgment against Abcon in the amount of $201,199.11 for rent arrears, and

remains unpaid.  (<u>Id.</u>, at ¶ 28.)

In addition, Abcon agreed as part of the settlement to pay "monthly use and

occupancy in the sum of $14,988.37 per month commencing October 1, 2005."  Abcon

ceased making any use and occupancy payments in September, 2006.  (<u>Id.</u>, at ¶ 29.)  In

April 2008, the Receiver filed a second holdover petition against Abcon and other

Zenobio affiliates.  (<u>Id.</u>, at ¶ 30.)  The holdover petition sought a judgment removing the

defendants from occupancy and awarding "$284,779.03, plus utility payments and use

and occupancy in the contracted amount of $14,988.37 per month, plus legal fees, costs

and disbursements."  (<u>Id.</u>, at ¶ 31.)

B.      **The Bankruptcy Case**

As noted, the debtor filed its chapter 11 petition on October 14, 2005, just prior to
the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005.  Pursuant to various stipulations between the parties, and the debtor's acquiescence
after those stipulations expired, the Receiver has remained in possession and control of
the Property throughout the bankruptcy case.  The case has been a contentious one,
pitting the debtor against the Bank, and vice versa, as often occurs in single asset real
estate bankruptcies.  Following the Bank's motion for relief from the automatic stay to
prosecute its foreclosure action, the parties entered into a consent order.  The consent
order allowed the Bank to prosecute the suit up to the point of a sale, but required the
Bank to seek further relief prior to conducting a sale.  (Consent Order Modifying the
Automatic Stay, dated Dec. 12, 2006)(ECF Doc. # 121.)   On April 28, 2008, the Bank
sought further relief to conduct the sale, (Motion to Authorize Enforcement of Judgment
of Foreclosure and Sale, dated April 28, 2008)(ECF Doc. # 255), but that motion was
held in abeyance while the confirmation hearing went forward.

The Bank had also moved to dismiss the chapter 11 case with prejudice.  (See
Amended Motion For an Order (1) Dismissing Case With Prejudice; or (2) Converting
Case to One Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(b),
dated May 23, 2007)(ECF Doc. # 145.)  The hearing was adjourned from time to time
while the debtor tried to confirm a plan, then sell the Property, and finally, confirm the
current, non-consensual Plan.  The Bank's objection to confirmation renewed its request
that the case be dismissed.  (See ECF Doc. # 253.)

Under pressure from the Bank, the debtor has filed several plans based on different ideas. The first plan proposed to transfer a 60% interest in the Property to a third party in exchange for funding. (See Debtor's Plan of Reorganization Dated April 26, 2006, at 14)(ECF Doc. # 42.) The debtor amended that plan to provide for the transfer of the Property to a new LLC formed by the debtor and a funder, subject to all existing indebtedness. (See Debtor's Disclosure Statement to Accompany Its First Amended Plan of Reorganization Dated May 3, 2006, at 23)(ECF Doc. # 45.) The debtor then proposed to transfer the Property to the new LLC free and clear of all indebtedness. (See Debtor's Second Amended Plan of Reorganization Dated July 24 , 2006, at 17)(ECF Doc. # 69, Ex. A.) The next version followed the same basic approach. Debtor's Third Amended Plan Of Reorganization Dated August 4, 2006, at 17-18)(ECF Doc. # 80.)

In August 2006, the Court approved the disclosure statement relating to the Third Amended Plan. (Order Approving Debtor's Second Amended Disclosure Statement and Fixing the Time: (1) For Filing of Acceptances or Rejections of the Plan; (2) For Hearing on Confirmation of the Plan; (3) For Filing Objections to Confirmation; and (4) Approving Form of Ballots, dated Aug. 23, 2006)(ECF Doc. # 74.) The debtor solicited the vote, and certified that the plan had been accepted or was deemed accepted by all classes. (Certification of Voting With Respect to Debtor's Third Amended Plan of Reorganization Dated August 4, 2006, dated Oct. 12, 2006, at ¶ 13)(ECF Doc. # 97.) The debtor did not confirm this plan, and amended it yet again. (Debtor's Fourth Amended Plan of Reorganization Dated July 26, 2007, at 18)(ECF Doc. # 158.)

By letter dated August 24, 2007, the debtor's attorney informed the Court that it was withdrawing its Fourth Amended Plan. (ECF Doc. # 171.) The proposed funder and

prospective tenant had backed out.  Instead, the debtor now intended to sell the Property

pursuant to 11 U.S.C. § 363, and then file a liquidating plan.  The debtor filed a motion to

authorize the sale of the Property on September 12, 2007 (the "Sale Motion"),[4] and

among other things, sought approval of auction procedures that fixed a minimum auction

price of $12 million.  This amount was sufficient to pay off the Bank's approximate $11

million debt.  (See Stipulation, at ¶16.)  The Bank filed a limited objection,[5] challenging,

inter alia, the minimum $12 million bid.  It argued that the minimum was too high, and

would chill the bidding.  In addition, it would prevent the Bank from credit bidding.[6]

Soon thereafter, the debtor consented to reduce the minimum bid to $8 million.

The auction went forward on or about October 30, 2007.  Zenobio's ex-partners

made the only cash bid of $8.725 million.  (See Tr. at 911; Stipulation, at ¶ 50.)  The

Bank made an overbid with a credit bid of $8,750,000.  (See Stipulation, at ¶ 50.)  Rather

than accept the Bank's bid, the debtor withdrew the Sale Motion.  (See id., at ¶ 51.)  It

---

[4]    Debtor's Motion For (A) An Order Authorizing And Approving (i) Auction Procedures In Connection With The Sale Of The Debtor's Real Property, (ii) Time, Date, And Place Of The Auction And The Sale Hearing, (iii) Forms Of Notice Of The Auction And The Sale Hearing, And (B) An Order Authorizing And Approving (i) Consummation Of A Purchase Agreement By The Debtor, And (ii) Sale Of Debtor's Real Property Free And Clear Of Liens And Other Interests Pursuant To Sections 105(a), 363 And 1146(A) Of The Bankruptcy Code And Federal Rules Of Bankruptcy Procedure 2002 And 6006, dated Sept. 12, 2007 (ECF Doc. # 176.)

[5]    Limited Objection of [the Bank] to the Debtor's Motion for Entry of an Order Authorizing And Approving (i) Auction Procedures in Connection with the Sale of the Debtor's Real Property, (ii) Time, Date, and Place of the Auction and the Sale Hearing, (iii) Forms of Notice of the Auction and the Sale Hearing, and (B) An Order Authorizing and Approving (i) Consummation of a Purchase Agreement by the Debtor, and (ii) Sale of Debtor's Real Property Free and Clear of Liens and Other Interests Pursuant to Sections 105(a), 363 and 1146(a) Of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 And 6006, dated Sept. 24, 2007 (ECF Doc. # 178.)

[6]    Actually, it would not prevent the Bank from credit bidding.  Instead, a $12 million minimum bid would force the Bank to put up $1 million in cash to cover the difference between the maximum amount of its secured claim ($11 million) and the minimum credit bid.

thereafter filed a Fifth Amended Plan on November 17, 2007, and subsequently filed another amendment that became the Plan currently under consideration.

**C    The Plan**

The Plan consists of seven classes of claims and interests, but only two non-insider classes are impaired, Classes 3 and 4.  Class 3 consists of the Bank's secured claim.  (Id., at 14, 15.)  The Plan proposes to stretch the Bank claim out for five years[7] with the option to prepay it.  (Id., at 14.)  Beginning with the Effective Date, the debtor will make monthly interest payments at the prime interest rate plus 1%.  (Id., at 14-15.)  If the debtor has cash on hand from operations in excess of $500,000, it will pay that excess, in reduction of principal, on January 1st of each year.  If not prepaid sooner, the debtor will pay the principal on the maturity date.  (Id., at 15-16.)  In short, unless the debtor meets the excess cash flow threshold, the Plan proposes a non-amortizing mortgage at 100% loan to value, with a balloon payment on the fifth anniversary of the Effective Date.  Class 3 rejected the Plan.

Class 4 includes the non-insider unsecured creditors.  (Id., at 15.)  Each class member had the option to elect to receive 40% on the Effective Date.  If a class member did not affirmatively make the election, or did not vote, the creditor would receive 100% over time, plus 8% interest as of the Effective Date, according to the following schedule: 20% on the Effective Date; 40% on the one year anniversary of the Effective Date and 40% on the second anniversary of the Effective Date.  (Id., at 16-17.)

---

[7]    The Plan states that the maturity date of the Bank's debt is February 1, 2012, but the debtor says it will mature five years after the confirmation date. ([Undated]Proposed Findings of Fact and Conclusions of Law Re: Debtor's Compliance with 11 U.S.C. §1129(a) and (b) In Connection with Confirmation Hearing on Debtor's First Modified Fifth Amended Plan of Reorganization Dated May 8, 2008, at ¶ 66)("Debtor's Proposed Findings & Conclusions")(ECF Doc. # 296.)

The result of the Class 4 vote was disputed.  According to the debtor's certification, two creditors voted to accept, and one, the Bank, voted to reject.  The debtor attributed the Bank's rejecting vote to a small claim that it had purchased from Melville Snow Contractors, Inc., and argued that the Bank never voted its potential undersecured claim.  Consequently, the class accepted the Plan.  (See Certification of Voting With Respect to Debtor's Fifth Amended Plan of Reorganization Dated November 13, 2007, dated Dec. 18, 2007, at ¶ 8)(ECF Doc. # 203.)  The Bank maintained that it also voted its undersecured claim to reject the Plan.[8]

There was some evidence to support the debtor's argument, but the matter required an evidentiary hearing and was left for another day.  Nevertheless, in light of the determination, infra, relating to the size of the Bank's undersecured claim, the Bank would hold a blocking vote.  If its undersecured claim was included in its rejecting vote, Class 4 rejected the Plan, and the Plan does not satisfy the requirement in 11 U.S.C. § 1129(a)(10) that at least one impaired class must accept a plan without counting the votes cast by insiders.  Because the Court has concluded that the Plan is not feasible, it is not necessary to decide this issue.

## DISCUSSION

### A.    Introduction

The debtor, as the proponent of the Plan, bears the burden of proof under section 1129 of the Bankruptcy Code by a preponderance of the evidence.  In re Worldcom, Inc., No. 02-13533(AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y Oct. 31, 2003).  Among other things, the debtor must demonstrate that the plan is feasible.  See 11 U.S.C. §

---

[8]    The ballot does not indicate the amount of the voted claim.

1129(a)(11) (The court must find that the "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.")  The plan must be workable and stand a reasonable likelihood of success.  Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988)("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); In re Leslie Fay Cos., 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997). ("The court must find that the plan is workable and has a reasonable likelihood of success.")  "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations."  In re Leslie Fay Cos., 207 B.R. at 789.

Because Class 3 rejected the Plan, the debtor must also satisfy the "cram down" provisions of § 1129(b).  It must demonstrate that the plan does not discriminate unfairly, and treats the Bank's secured claim fairly and equitably.  Section 1129(b)(2)(A) provides, in relevant part:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> > (A) With respect to a class of secured claims, the plan provides--
> >
> > > (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> > >
> > > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

The Plan proposes to pay the Bank out over five years. The Bank will retain its lien until its secured claim is paid, (Plan, at 25), and the Plan, therefore, satisfies § 1129(b)(2)(A)(i)(I). To meet § 1129(b)(2)(A)(i)(II), the Plan must pay the Bank the present value of its secured claim. "[A] creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." Rake v. Wade, 508 U.S. 464, 472 n. 8 (1993).

**B.    The Bank Debt**

**1.    The Pre-Petition Claim**

The first step in deciding the contested confirmation issues is to determine the amount that the debtor owes the Bank. The Bank filed a timely proof of claim asserting a secured pre-petition claim in the amount of $8,396,208.53, plus other amounts which may be due as of the Filing Date. (Stipulation, at ¶ 33.) The Bank subsequently filed an amended, secured pre-petition claim in the amount of $8,659,879.41. (See Creditor's Exhibit ("CX") 22.) The amended claim was executed and filed in accordance with the Bankruptcy Rules, and constituted prima facie evidence of the validity and amount of the Bank's claim. See FED. R. BANKR. P. 3001(f). In addition, Joel Polcari, an asset manager for the Bank who signed the amended claim, testified regarding its preparation and components. Although the debtor offered evidence, discussed immediately below, that the Receiver had reimbursed the Bank on account of post-petition real estate taxes paid by the Bank, the reimbursements did not affect the pre-petition claim. Accordingly, I

find that the Bank holds a pre-petition claim in the amount of $8,659,879.41,[9] rounded to $8.66 million.

### 2.    The Post-Petition Claim

Since 2003, the Bank has paid at least $353,620 in real estate taxes on the Property.  (Stipulation, at ¶ 18.)  A substantial portion related to post-petition taxes, and the Bank filed an amended request for the payment of an administrative claim in the amount of $253,618.04.  (See CX 27.)  The debtor established at trial that the Receiver had reimbursed the Bank in the amount of $25,000 on account of real estate taxes. Polcari thought this payment reimbursed the Bank for its payment of post-petition real estate taxes, but was not certain.  (Tr. at 546.)  The amended administrative claim did not credit the $25,000 payment against the administrative claim.  (Id., at 547.)  In addition, counsel stipulated that the Receiver had reimbursed an additional $92,360, and implied that it related to post-petition taxes included in the amended administrative claim.  (See id., at 547, 633-34.)  The debtor is, therefore, entitled to a credit of $117,360 against the Bank's administrative claim based upon reimbursements by the Receiver.  After applying this credit, the Bank's administrative claim is fixed, for confirmation purposes, in the amount of $136,258.04.[10]

---

[9]    The debtor had objected to the Bank's original proof of claim, and the amended claim did not moot the objection.  Although the Court's finding is not intended to resolve the claim objection or fix the allowed amount of the claim for distribution purposes, it does determine the amount of the claim for purposes of the confirmation hearing, including feasibility and "cram down."

[10]    The unpaid real estate taxes on the Property, as of July 1, 2008, totaled $229,321.08.  (See Stipulation, at ¶ 19; CX 15; Tr. at 535-37.)  The record does not reflect whether the Bank has since paid all or a portion of theses taxes.

### C.    The Value of the Property

The Bank's claim is secured to the extent of the value of its collateral, and
unsecured to the extent that it exceeds the value.  11 U.S.C. § 506(a).  The Court heard
the testimony of two valuation experts, and received their reports.  The debtor's expert,
Max Rosin of Rosin Associates, appraised the "as is" market value of the Property, as of
December 17, 2007, in the amount of $8.9 million.  (Debtor's Exhibit ("DX") M, ("Rosin
Report") at i.)The Bank's expert, Timothy Barnes, of Cushman and Wakefield of Long
Island, Inc., appraised the "as is" market value of the Property, as of March 7, 2008, at
$8.16 million.  (CX 1, ("Barnes Report") at 1.)   The valuations differed by $740,000, or
less than 10%.

Both experts relied primarily on the discounted cash flow method to value the
Property.  Consequently, the value was dictated by the projected revenue, operating
expenses, and non-operating expenses, such as deferred maintenance, over several years.
Barnes actually forecasted higher gross revenues over the first five years, but also
forecasted higher expenses.[11]  (Tr. at 782-83; compare Barnes Report, at 48 with Rosin
Report, at unnumbered page following p. 48.)

The projected income and expenses during the first year after the Effective Date
are particularly important for another reason.  If the debtor cannot make it through the
first year, it will not make it beyond the first year.  In that case, the projections after the
first year are meaningless, and the Plan will not be feasible.  A significant reason for the
$740,000 difference in valuation related to the estimated cost of deferred maintenance

---

[11]    The experts used the same capitalization rate of 8%, (Barnes Report, at 46; Rosin Report, at 47),
but Barnes used a lower discount rate (9.25%)(Barnes Report, at 46), than Rosin (10.50%)(Rosin Report, at
47.)  Other things being equal, the use of a lower discount rate would result in a higher value.  (Tr. at 805.)

during the first year.  Both experts relied on estimates prepared by others, and the next portion of this opinion reviews those estimates and makes appropriate adjustments.

### 1.   Deferred Maintenance

#### a.  Introduction

The projected expenses for deferred maintenance generally fell into two categories: (1) the restoration and repair of the interior vacant tenant spaces, and (2) everything else, including the exterior of the Building, and in particular, the roof.   The Bank's expert, Christopher Corduan, estimated that the deferred maintenance would cost $1,548,600 during the first year following the Effective Date.  He attributed $576,000 to the interior vacant space and $972,000 for the rest of the work.  (CX 2 ("Corduan Report"), at 3.)  The largest part of the "other" deferred maintenance pertained to the repair of the leaking roof.  Corduan ascribed $486,000 to the repair and drainage of the roof and an additional $96,000 to repave it.  He also estimated a cost of $230,400 to repair the framing and structural systems (i.e., the steel support beams), (id.), and $160,200 for miscellaneous other repairs.  (See id.)

The debtor did not call an independent expert to testify.  Instead, the debtor relied primarily on Zenobio.  Zenobio predicted that the capital expenditures would total $364,900, plus another $239,500 for the work required in the interior, vacant space.  (DX C, at 2.)  Zenobio attributed $168,000 to the roof, nothing to the structural systems, and $196,000 to everything else.

The debtor also elicited the testimony of Augustino D'Alonzo of Cow Bay Contracting Corporation -- a contractor that had worked with Zenobio at the Property in

the past.  D'Alonzo believed that Cow Bay would charge about $714,000 to complete the

job outlined by Zenobio.  The work in the vacant tenant space would run approximately

$303,000.  D'Alonzo estimated that the balance of the remaining work, including the

roof, would cost $410,040.  (See DX D; Debtor's Proposed Findings & Conclusions, at

¶¶ 87-88.)  He attributed $214,775 to the roof, nothing to framing and structural systems

and approximately $195,265 to everything else.

### b.  The Vacant Tenant Space

The evidence revealed two, distinct types of tenant expenditures, but only one fell

into the category of deferred maintenance.  Deferred maintenance included the work

needed to make the premises presentable to prospective tenants -- to create a "vanilla

box."  This included demolition and replacement of all interior finishes, and providing

basic HVAC systems, electric systems, lights, flooring, code base drywall, ceilings, any

type of diffusers that are needed, and all the perimeter walls.  (Tr. at 670.)

In addition, a landlord must usually do additional work to fit the premises for the

needs of a particular tenant when the tenant signs or renews a lease.  This is referred to as

tenant improvements, or TI, (see id., at 671-72), and is not considered deferred

maintenance.

According to Zenobio, the debtor needed to spend $239,500 during the first year

after the Effective Date to restore and improve the vacant tenant space.  (DX C, at 2.)

This amount, however, included $100,000 labeled as "Additional New Tenant

Improvements," and referred to the tenant specific TI.  (See Tr. at 91-92, 129, 178-79.)

In other words, Zenobio estimated that it would cost less than $140,000 to create the "vanilla box."  (See DX C, at 2.)

D'Alonzo opined that he would charge $303,542 to complete the necessary work in vacant tenant spaces.  (Debtor's Proposed Findings & Conclusions, at ¶¶ 87-88; see DX D, at p. 11.)  He did not, however, propose to create a "vanilla box" in the vacant space.  D'Alonzo's cost estimate restored the premises to its existing condition, so that the tenant could return to its space.  (Tr. at 345-46, 348.)  D'Alonzo testified that if he created a "vanilla box," the work would cost less than $303,542, but did not say how much less.  (See Tr. at 349-50.)  His estimate did not include the normal TI for which Zenobio allocated $100,000, (see Tr. at 348-49), and he did not budget for any contingencies.  (Tr. at 333, 335.)

Both Zenobio and Cow Bay took a "bottom up" approach.  Zenobio determined what specific work he thought needed to be done to create a "vanilla box," priced each item of work, and added the itemized costs (plus a contingency) to arrive at his overall estimate.  His proposal, (DX C), did not include overhead and profit, because he intended to do the work through one of his affiliates, and did not plan to charge himself for overhead and profit.  (See Tr. at 76, 195.)  Similarly, Zenobio provided the scope of the work to Cow Boy, and D'Alonzo priced the work that Zenobio had identified.  Cow Boy's proposal included overhead and profit.

Corduan opined that the debtor would have to spend $576,000 to restore and finish the vacant tenant space.  (Corduan Report, at 3.)  This amount represented the estimated cost of creating a "vanilla box," and did not include the amounts that the debtor

would have to credit against future rent or actually pay for tenant improvements when the space was rented.  (Corduan Report, at 11.)  Corduan had twice inspected the vacant tenant spaces, the lobby and the common areas, (Tr. at 645-46), and supplemented his testimony with photographs that he had taken.  In general, he described the overall condition of the Property as poor to fair with a significant amount of deferred maintenance.  (Id., at 646.)  Many of the areas in the Building had been left in a neglected condition, and "[t]he majority of the second floor tenant space appeared unusable and untenantable."  (Id., at 646.)

The most significant problem was water damage due to the leaky roof.  He found numerous leaks and puddles, and water damage to the windows.  (Id., at 646, 649.)  The debtor used pails or tarps to collect leaking water, and hoses and pumps to redirect the collected water to garbage pails or the janitor's slop sink.  (Id., at 651, 652.)  The water damage had penetrated the wallpaper, the drywall and the ceiling.  (Id., at 652.)  Water had completely saturated insulation at one spot, where mold was now growing heavily.  (Id., at 652-53.)  Corduan also noted unshielded electric cables that were starting to corrode, and constituted building code violations.  (Id., at 659, 660.)

In determining the appropriate budget for the repair and restoration of the interior space, Corduan took different approach.  Unlike Zenobio and Cow Bay, he did not price any specific job.  Instead, he estimated that the second floor consisted of 24,000 square feet.  He projected that it would cost $20 per square foot, "all in," to create the "vanilla box."  (Id., at 670.)  He based the square foot cost estimate on known actual costs incurred by owners doing similar work.  (See id., at 670, 685)  He then added a 20% contingency.

I credit Corduan's estimate of the required work, with one modification. His qualifications were more compelling, his testimony more convincing, and his methodology more reliable. Corduan essentially concluded that the Property was in serious disrepair, and needed a major overhaul. He is a registered professional engineer, (id., at 639), and has substantial experience preparing property condition assessments, construction plans and cost reviews as well as construction monitoring work for real estate companies. (Id., at 641-42.) His duties include reviewing plans, drawings and other documentation, and opining on the adequacy of the budget for the work. (Id., at 642.) He based his analysis and conclusions on the same methods and objective criteria that he brings to all of his jobs. (See id., at 720-21.)

In contrast, Zenobio's more limited approach to the deferred maintenance, which D'Alonzo adopted, lacked objectivity. Zenobio had a strong incentive to minimize the amount of work, and the cost of that work. The success of the Plan depended on his ability to fund those costs, and if the Plan failed and the Bank foreclosed, Zenobio would face a $1.5 million liability for the recapture of taxes.[12] (Id., at 141.) Corduan, in this regard, described the Zenobio approach as "cosmetic" and a "patch," (Tr. at 678, see 712-13), that proposed to fix what you could see, but ignored latent though probable defects. He gave one example. Corduan proposed removing all of the drywall; Zenobio proposed removing the only the parts of the drywall that were obviously wet. Mold, however, grows on both sides of drywall, including the side that is not visible. (Tr. at 678.) If you remove only the wet parts that you see, you leave the wet, moldy parts that you don't.

---

[12] This is the same amount that Zenobio proposed to invest under the Plan.

I reject, however, the addition of the 20% contingency.  Corduan testified that he normally estimates the cost of creating a "vanilla box" at $15 per square foot in a "clean" building.  He raised that to $20 per square foot because the condition of the Building was poor, and he "wasn't so sure what we would be in for."  (Id., at 672.)  Thus, his estimate already accounted for a 33% contingency based on unknown discoveries, and an additional 20% contingency unduly inflated the estimate.  Accordingly, I find that the estimated cost of restoring the vacant interior space to a "vanilla box" condition is $480,000.

### c.    The Roof

The Court received extensive testimony, scientific evidence and documentary proof relating to the roof, and the cost of repairing it.   The roof covers approximately 27,000 square feet.  (Id., at 665.)  It is used for parking, and is accessed through a ramp leading up from the ground level.  (Id., at 67-68.)  It has a steel deck base.  A deck consisting of concrete reinforced by weld wire mesh sits on top of the steel deck.[13]  The concrete deck is covered with a waterproof membrane.  Finally, a one and one half inch layer of asphalt, or macadam, covers membrane.  (Id., at 63-64.)

The Building was substantially renovated, and the roof was installed, in 1986.  (Id., at 33.)  In 1994, Cow Bay repaired approximately 6,000 square feet.  (Id., at 67.)  The roof leaks in numerous other places, and both sides agreed that it is in need of repair.  The scope of the work and the manner of doing it separated the parties.

---

[13]    The debtor's structural engineer, Peter Yen, testified on cross-examination that the wire mesh reinforcement does not add any structural support to the concrete.  (Id., at 963.)

The Debtor proposed to repair and replace the part of the roof that was not repaired in 1994.  The work would be done using a Kasi 300 machine to remove the asphalt and membrane.  (Id., at 287.)  The Kasi machine heats up a 48 square foot area of asphalt at one time.  It takes 4 to 6 minutes to heat the area to the point that the asphalt and the roof membrane can be removed together.  (Id., at 320.)  Once the asphalt and membrane are removed, the debtor can patch any cracks or holes in the concrete, and then replace the membrane and the asphalt.  (See id., at 101, 194.)  Both Mr. D'Alonzo and the Debtor's cost projections for the roof repairs relied on the use of a Kasi machine to reduce the labor costs.  (Id., at 70-72; 287-88.)

Corduan said the roof required a different and more labor-intensive approach.  He advocated a full roof replacement, including the 6,000 square feet replaced in 1994.  In addition to stripping the asphalt and membrane, and patching the cracks in the concrete, Corduan also recommended removing all the HVAC equipment, reinstalling it on proper curbing, refurbishing the power pit walls and providing a proper flashing system for the power pits.  (Id., at 661.)

Corduan has overseen many roof replacements, and explained that it ordinarily costs between $9 and $10 per square foot to replace a roof that does not have an asphalt top layer.  (Id., at 662-63.)  He ultimately used $10 per square foot, an estimate that covered all of the work just described.  (See id., at 663.)  Because the removal of the asphalt would be "pretty labor intensive," he added an extra $5 per square foot to cover those costs.  (Id., at 663.)  Finally, he added a 20% contingency "because I really was not one hundred percent sure of what we're going to find when we open that roof up."  (Id.)

The roof would then have to be repaved.  Typically, this costs $2 per square foot. (See id., at 665.)  He added an additional $1 per square foot because the Building presented constraints in removing the material at a normal pace.  (Id.)  It appears that he also added a 20% contingency, and this calculation produced an estimate of $97,200.

Corduan criticized the use of the Kasi machine as proposed by Zenobio and D'Alonzo.  He stated that the machine was designed to patch up potholes and make small repairs on large pavement jobs; it is not appropriate for removing all of the asphalt on the entire roof.  (Id., at 664.)  As Corduan explained it, using the Kasi machine to replace the roof would be "like painting a big building with a paint brush."  (Id., at 677.)

Once again, I credit Corduan's opinion regarding the scope and cost of the work. A waterproofing membrane is usually warranted for between 20 and 30 years, although its use under a parking surface may decrease its useful life.  (Id., at 662.)  Consequently, the life span of the roof membrane was probably 20 years.  (Id., at 719.)  The 1994 repair is now 15 years old, and will need to be replaced in a few years.  (See id.)  Hence, the entire roof should be replaced at one time.

I also credit Corduan's testimony that the Kasi machine was neither designed nor appropriate for the use proposed by Zenobio and D'Alonzo, (Id., at 663- 664), and accordingly, they underestimated the labor costs.  Except for some testing, D'Alonzo never used the machine to do the type of work he and the Debtor proposed.  (Tr. at 350.) D'Alonzo also conceded that the Kasi machine is not marketed for the use that he and

Zenobio proposed.[14]  (Tr. at 321-22.)  It appears that Zenobio proposed and D'Alonzo

acquiesced in an untried method of repaving a roof simply because it held out the hope of

keeping the labor costs down.

Other aspects of D'Alonzo's and Zenobio's approach, and their opinions

regarding cost, also gave me pause.  D'Alonzo testified that he would remove the debris

from the roof work by parking a 10,000 lb. dump truck at the top of the ramp, and

loading it up with another 10,000 lbs. of debris.  (Tr. at 324.)  D'Alonzo conceded that

the roof is not designed to hold vehicles weighing more than 5,000 lbs., but testified that

the ramp was somehow stronger than the roof.  (Id., at 325-26.)  As a result, Cow Bay

grossly underestimated the labor costs in moving materials.  (Id., at 677, 695.)

Although I credit Corduan's opinion regarding the scope of the work and method

of doing it, the 20% contingency that he added appeared unnecessary.  The principal

contingency was already reflected in the estimate.  Corduan was concerned about the

labor-intensive nature of the project, and took that into account.  He included an extra $5

per square foot to cover the labor cost of removing the roof, and an additional $1 per

square foot for repaving it.  In short, his labor contingency represented a 50% increase

over the typical cost of a comparable job.  An extra 20% contingency, over and above the

50% labor contingency, overestimated the cost.  Accordingly, I conclude that the

estimated cost of removing the existing asphalt and membrane and replacing it is

$486,000.

---

[14]        According to the manufacturer's promotional material, the Kasi 300 machine is an "ideal unit for
smaller patching jobs or completing paver punch list items."  (DX J, at 1.)

d.      **The Structural Work**

The last major category of deferred maintenance that affected the opinions related to the proposals for dealing with the steel infrastructure.  Corduan attributed $230,400 to framing and structural steel work.  He had observed corrosion in exposed areas of the steel support beams during his prior inspections, and was concerned that there was extensive corrosion that he could not see.  (Id., at 666.)  He proposed to expose all of the structural surfaces, clean and paint everything at a minimum, and replace the most corroded areas.  (Id., at 666-67.)

Corduan is not a structural engineer, (see id., at 713), and he did not have access to much of the space beneath the roof.  He did not perform any structural tests, and did not identify any structural repairs that had to be made.  (Id., at 685-88)  The debtor's structural steel expert, Peter Yen, examined the 300 beams that make up the parking deck, (id., at 955), and conducted thorough testing of the structural integrity of the roof. (See DX X, Y.)   He opined that the only item that needed remediation was the rusted steel on one beam (there are approximately 300 beams), and the work could be remediated "very easily".  (Tr. at 955.)  I found his testimony credible, and conclude that Corduan's estimated cost for this work should be rejected.

e.      **The Remaining Work**

Zenobio and D'Alonzo allocated approximately $196,000 to the remaining miscellaneous items of deferred maintenance.  Corduan estimated that it would cost $160,200.  I will accept Corduan's lower figure, and round it down to 160,000.

f.      Recapitulation

Based on the foregoing, I find that the total estimated cost for deferred maintenance during the year following Effective Date is $1,126,000, rounded to $1.1 million.  The $1,126,00 was computed as follows:

| Nature of Work | Amount |
|---|---|
| Interior, vacant space | 480,000 |
| Roof restoration and repaving | 486,000 |
| Other work | 160,000 |
| | **1,126,000** |

This amount is approximately $450,000 less than the number Barnes used and nearly $750,000 more than what Rosin estimated.  Since these expenses will be incurred in the first year, and hence, are less affected by discount rates, the differences go a long way to explaining the $740,000 difference in the two appraisals.[15]  Barnes, however, identified several other differences between the experts' discounted cash flow analyses that contributed to the different conclusions pertaining to the market value of the Property.

---

[15]      If this was the only difference between the two appraisals, and was allocated between them, the market value of the Property would be around $8,437,500.  The deferred maintenance estimates used by Barnes and Rosin differed by a little more than $1.19 million ($1,548,600 minus $356,900), which I have rounded to $1.2 million.  The difference between the appraisals was smaller—only $740,000.  Assuming no other differences, every $1 error in estimating the deferred maintenance costs translated into a $.6167 error in market value.  Barnes' $450,000 overestimate of deferred maintenance costs led him to underestimate the value by $277,500.  Conversely, Rosin's underestimation by $750,000 led him to overestimate the value by $462,500.

### 2.    Income

#### a.  The Owner-Occupied Space

Rosin assumed that the debtor would continue to occupy its current space (7559 square feet), and immediately start paying market rent ($26 per square foot) on the Effective Date.  (Tr. at 754.)  This assumption resulted in immediate income and little or no TI, and added approximately $200,000 of positive cash flow during the first year.

Barnes testified that no prudent investor would make that assumption.  (Id., at 773.)  Instead, the prudent investor would treat the space as vacant based on its history: no rent had been paid for some time, there was no existing obligation to pay rent, and there was a judgment against the existing tenant for failure to pay rent.  (Id., at 759-60.) He assumed for valuation purposes, therefore, that it would take six months to rent the owner-occupied space, and that the debtor would have to pay for the TI required by the new tenant.  (Id., at 773.)  According to Barnes, the lost rent and additional TI accounted for an approximate $200,000 difference in the valuation.  (Id., at 773-74.)

The Plan states that upon confirmation, the debtor will enter into a lease with its affiliate, Recal Associates, at the prevailing market rate.  (Plan, at 18.)  Although, Zenobio testified that Recal had the financial ability to pay the rent,[16] (Tr. at 271, 889), I conclude that Barnes' valuation assumptions relating to the owner-occupied space were more credible.  The debtor and its affiliates, including Recal, have not paid rent or use and occupancy for most of the past four years.  In fact, Abcon, a Zenobio affiliate, failed

---

[16]    The Bank implied that it would not consent to the Recal lease, a requirement under the mortgage. (See CX 7, at § 3.6(a).)   Assuming that Recal was otherwise satisfactory and creditworthy, the Bank could not veto Recal's tenancy and complain about the lack of rental income.

to honor a stipulation in which it expressly promised to pay use and occupancy on a going forward basis. (See CX 13.) In addition, the state court held the debtor and Zenobio in contempt for failing to turn over tenant security deposits to the Receiver. (CX 24.)

Zenobio offered a curious explanation for the failure to pay rent. He disapproved of the Receiver and his management of the Property, charged that the Receiver was dishonest, and refused to pay any rent to him. (Tr. at 162-63, 272.) Furthermore, Abcon ignored its promise to pay use and occupancy because Zenobio felt the Receiver would deplete the funds through improper payments. (Id., at 268-69.) Zenobio's enmity is so great that he attributed the Receiver's holdover lawsuits to harassment, rather than the failure to pay rent. (See id., at 161-62.)

Zenobio's view of the Receiver is hard to square with Zenobio's actions. Ordinarily, the commencement of a bankruptcy case terminates a receivership. See 11 U.S.C. § 543. The debtor consented to keep the Receiver in place for a limited term, agreed to renew his term notwithstanding his alleged failure to comply with the parties' stipulations, (Tr. at 273), never sought to oust him due to his alleged mismanagement or dishonest management of the Property, and left him in control of the Property even after the agreed term had expired. It is difficult to believe that Zenobio was so dissatisfied with the Receiver, yet did nothing about it. It appears more likely that Zenobio and his affiliates were financially unable to pay the use and occupancy, and Zenobio has not pointed to any change in circumstances that would suddenly enable them to do so now.

But if Zenobio's loathing for the Receiver actually explained the rent defaults, the Bank has cause to worry. The debtor also failed to pay the mortgage or the real estate taxes since 2003, suggesting that Zenobio does not like the Bank either. In fact, the Bank commenced the foreclosure suit, and procured the appointment of the very Receiver that Zenobio despises. The two sides have had a contentious relationship in this case during the last three years. Furthermore, Zenobio has little incentive to cause Recal to pay rent in a timely fashion, if at all, since the Plan requires the debtor to pay excess cash flow to the Bank in reduction of its principal. In short, a reasonably prudent investor would not assume that Recal would pay rent in full from day one, and instead, would view the owner-occupied premises, like Barnes did, as vacant space.

### b.      Reimbursement For Common Area Utilities

Zenobio testified that 100% of the Building's electricity and heat were passed through to the tenants.[17] (Id. at 173-74. See id., at 858.) Summarizing the terms of a typical lease, he testified that the tenant was obligated to pay the "sub-meter plus the landlord's administrative charge . . . [which] is, in fact the twenty percent loss factor." (Tr. at 859.) According to Zenobio, the meter reading company generates a bill that includes the loss factor, and the loss factor covers the common area. (See id.) Rosin accepted this position, and included it in his analysis, treating the reimbursed common area charges as income.

Barnes disagreed, stating that it was not the common practice for tenants to reimburse the owner for the cost of the common area utilities. (Id., at 762.) Barnes' own

---

[17]      Zenobio testified that the electricity pass-through was limited by the percentage of Building occupancy. (Tr. at 173-74.)

discounted cash flow analysis did not include any reimbursement (<u>i.e.</u>, income) generated by the reimbursement of common area utilities. (<u>Id.</u>, at 761.) According to Barnes, Rosin's assumption inflated the value of the Property by $400,000 to $500,000. (<u>Id.</u>, at 763-64.)

Barnes' allocation of the common area utility charges to the owner is supported by the credible evidence. Under the lease between the Receiver and School Specialty, Inc., (CX 28), the only lease received in evidence, School Specialty rented 12,000 gross rentable square feet. (<u>Id.</u>, at ¶ 1(c).) The landlord supplied electricity to the "demised premises" by sub meter for the space shown in an Exhibit A to the lease.[18] (<u>Id.</u>, at ¶ 11(b).) The tenant was obligated to pay the submetered amount plus "reimbursement to Landlord of Landlord costs as permitted by the Public Service Commission." (<u>Id.</u>) The landlord had the right to install a BTU meter on the demised premises, and the tenant was obligated to pay for the heat use measured by the meter. (<u>Id.</u>, at ¶ 13.) Nothing in the School Specialty lease expressly obligated it to pay common area maintenance. In addition, Barnes testified without objection that he had checked with the company that read the meters, and confirmed that the charges were limited to actual usage and no profit factor was added to account for any unmetered use in the common areas. (<u>See</u> Tr. at 775-76.)

I discount Zenobio's contrary testimony. It was based on the terms of the typical lease, but the debtor failed to offer any lease into evidence with those terms. The School Specialty lease did not refer to a 20% or any other loss factor or administrative charge.

---

[18]    Exhibit A was omitted from the copy of the School Specialty lease received in evidence.

Although the School Specialty lease allowed the landlord to recover the costs approved

by the Public Service Commission, no evidence was offered to show what those costs

were, or whether they had any relationship to the common area maintenance charges.

### 3.    Expenses

Rosin projected many expenses based on information that Zenobio had provided,

whereas Barnes estimated the expenses on a cost per square foot basis, in light of the

actual operating expenses incurred by comparable buildings in the area.    (Id., at 765-66.)

He also received expense information from the Receiver.  (Id., at 783.)  Barnes testified

that Rosin's estimates were "somewhat low," (Id., at 772-73), and to the extent Rosin

relied on Zenobio's income and expense projections, his valuation was unreliable.  If one

used Rosin's methodology but substituted Zenobio's income and expense projections, the

market value of the Property would be $13 million.  (Id., at 780.)  No one seriously

believed that the Property was worth anything near that amount, indicating that there was

something very wrong with Zenobio's projections.

The Court also received specific evidence on one particular expense -- the

projected cleaning costs once the Building was stabilized.  Zenobio testified that based on

what the debtor had paid and what the Receiver was paying to the current cleaning

contractor, the cost should be $67,000.  (Id., at 858.)  On cross, Barnes acknowledged

that if the stabilized cleaning costs were $60,000 and not the $139,000 that he had

assumed in his cash flow analysis, the market value under his own appraisal would have

been $500,000 higher.  (Id., at 791.)

I reject Zenobio's testimony relating to the cleaning costs, and accept Barnes'

assumptions.  Barnes' assumptions were based on what comparable buildings paid;

Zenobio based his testimony on the costs he paid for cleaning the Building in 2002.[19]

The debtor did not produce a cleaning contract that set forth the current rate, or call a

representative of the cleaning company to testify regarding the current rates.

Furthermore, the debtor's counsel did not explore the cleaning costs with the Receiver

during his testimony.  Finally, it was not apparent that Zenobio was even familiar with

the current rates as the Receiver displaced him in 2004.

### 4.    Conclusion Regarding Value

Virtually all of the $740,000 difference between the two appraisals was

attributable to assumptions that Rosin made and the Court rejected.  The one assumption

that affected both appraisals related to the deferred maintenance.  Barnes was $450,000

too high, and Rosin was $750,000 too low.  Barnes did not explain how the different

assumptions regarding deferred maintenance affected the ultimate market value.  And

although he estimated the effect on value of several assumptions in the two appraisals,

such as the common area maintenance charges and absorption of the owner-occupied

space, his testimony implied that the appraisals should differ by more that $740,000.

Based on what has been said, and in light of the conclusion that Rosin's appraisal

is seriously flawed, I will allocate 80% of the difference of $740,000 between the two

appraisals to Rosin and 20% of the difference to Barnes.  In other words, Rosin's

---

[19]     Zenobio testified that in 2002, the debtor paid $44,000 in actual cleaning costs.  (Tr. at 857.)  The
rate was based on the occupied premises at $.70 per square foot.  (Id.)  He stated that the Receiver was
currently paying the cleaning company $48,000, implying that the Receiver was overpaying based on the
old rate.  (Id., at 858.)  It is equally plausible that the rates increased between 2002 and 2008, and that
$48,000 reflects the cost for cleaning the occupied portion of a Building that is substantially vacant.

appraisal should be reduced by $592,000 and Barnes' appraisal should be increased by

$148,000.  Accordingly, I find that the Property has an "as is" market value of

$8,308,000, rounded to $8.3 million.[20]

### 5.    Other Evidence of Value

#### a.  The August 2007 Appraisal

In an attempt to impeach Barnes' appraisal, the debtor pointed to an August 2007

appraisal prepared by Barnes' firm, Cushman & Wakefield, that valued the Property at

$13.2 million.  (DX S.)  Barnes did not participate in the preparation of the August 2007

appraisal.  (Tr. at 771.)

Barnes explained why his own March 2008 appraisal was more accurate.  The

previous appraiser had not received any financial information from the Receiver or other

information regarding the operating history of the Property.  Consequently, the appraiser

was forced to make estimated projections.  (Tr. at 771.)  In addition, the appraiser did not

have a condition report, and did not make any deduction for deferred maintenance.  (Tr.

at 771.)  The August 2007 appraiser made only a cursory inspection of the premises, and

did not gain access to the interior.  (Tr. at 801.)  Furthermore, the sub-market on Long

---

[20]    The Bank's security interest may extend to the funds held by the Receiver.  The Receiver advised
the Bank that he projected that he would have $184,707.40 in his account on April 30, 2008 against which
he anticipated payables of approximately $180,000 in accounts payable, legal fees and the Receiver's
commission.  (Stipulation, at ¶ 25.)  The debtor disputed the latter charges, and has asserted counterclaims
against the Receiver.

I have not considered the Receiver's funds as part of the Bank's collateral.  First, the charges,
though disputed, essentially left the Receiver with zero as of April 30, 2008 date.  Second, the debtor must
pay the present value of the secured claim as of the Effective Date.  The amount in the Receiver's account
fluctuated, and the debtor failed to offer evidence at the trial regarding the amounts he was holding at any
time closer to the approximate Effective Date.  Although the debtor asserts that the Receiver had $212,597
as of October 15, 2008, (Debtor's Proposed Findings & Conclusions, at ¶ 78), it did not offer evidence at trial to
support this contention.

Island had already begun to deteriorate by the time Barnes prepared his appraisal. (Tr. at 807.) Finally, the appropriate discount and capitalization rates increased between August 2007 and March 2008, and Barnes' use of higher rates translated into a lower valuation. (Tr. at 771-72.)

The August 2007 appraisal is not entitled to any weight. Aside from the reasons described by Barnes, the bottom line is that no one thinks the $13.2 million value is right. It exceeds Rosin's valuation by more than $4 million and Barnes" by $5 million. In addition, the debtor's interest rate expert, James Dougherty, a commercial loan officer, calculated the value at $7.93 million. (DX O; accord Tr. at 470.)

####   b.     The Aborted Sale

The debtor also pointed to the aborted October 2007 sale, discussed earlier, as proof that the Property is worth more than the Bank's appraisal. As noted, the Bank made a credit bid of $8,750,000, and the debtor withdrew the Sale Motion. The debtor contends that the Bank's credit bid provided evidence of a value that supported Rosin's appraisal.

Assuming that the Bank's credit bid provided evidence of value in October 2007, Rosin's appraisal spoke as of December 17, 2007, and Barnes appraisal spoke as of March 2008. Barnes testified that the decline in the credit markets that began during the summer of 2007 hit home during the first quarter of 2008. (Tr. at 807.) By then, the sub-markets in Nassau had weakened, and it was worse than the previous year. (Tr. at 810.) His testimony implied that the value of the real estate declined, and a drop in value from

$8,750,000 in October 2007 to $8.3 million in March 2008 – roughly 5% -- is consistent with this testimony.

The auction price nevertheless supported two further conclusions if, as the debtor argued, it accurately reflected the market value at the time.  First, it undercut the opinion in the August 2007 appraisal that the Property was worth $13.2 million.  The auction occurred only two months later.  Although the Property was probably worth more in August than in October, it is difficult to believe that its value dropped by one third during that period.  Second it impeached Rosin's higher valuation, rendered two months later in a declining real estate market.

**D.      Feasibility**

Although feasibility is closely connected to the valuation based on discounted cash flow, it differs in one important respect.  Instead of looking at cash flow over the next five years, the feasibility analysis in this case turns primarily on the cash flow during the first year.  The ability to generate cash flow in the future depends on the ability to make the numerous capital expenditures and restore the vacant tenant space today.

Even if I accepted Zenobio's projections, which I have already rejected, the Plan would not be feasible.  Zenobio projected negative cash flow from operations and capital improvements of $1,146,459 during the first year.  (DX C, at 3.)  On that basis, Zenobio's $1.5 million investment through his affiliates would be sufficient to pay all costs, including the Plan-related costs, and create a sizeable reserve.  His analysis identified $656,000 in other "Potential Funding Sources," (id.), but failed to adduce evidence that ascribed value to these sources during the first year.  Accordingly, they will be ignored.

34

Zenobio grossly underestimated the plan payments that the debtor eventually conceded it would have to make or reserve for on the Effective Date. Zenobio budgeted $286,600 in "Other Costs," which included the debtor's bankruptcy legal fees ($214,100), payments to the unsecured creditors ($42,500) and a contingency ($30,000). (DX C, at 2.) The debtor now acknowledges that it must pay or reserve for $1,266,427 on the Effective Date, or $980,000 more than Zenobio projected. (See Debtor's Proposed Findings & Conclusions, at ¶ 76.) The principal differences are the legal fees ($575,000, or $360,000 more than Zenobio budgeted), and two expenses Zenobio did not consider: the Bank's administrative claim ($253,618) and unpaid post-petition real property taxes ($362,777). (Id.) The additional $980,000, added to the $1,146,459 that Zenobio projected, produces a shortfall during the first year of roughly $2 million. Zenobio testified, in general terms, that he could and would put more money into the case to cover any shortfall, (Tr. at 165), but the debtor failed to adduce evidence that he had the ability or inclination to invest another $500,000.

Moreover, the evidence showed that the actual shortfall would be much more than Zenobio's projections suggested. Both Rosin and Barnes projected negative cash flow before debt service during the first year, without giving any consideration to Plan costs. The following chart, which summarizes the negative cash flow during the first year, begins with their assumptions.[21] It then makes the adjustments required by Court's findings. In fact, after the differences resulting from the deferred maintenance projections are reallocated between the appraisals, the two experts reach remarkably similar results:

---

[21] The negative cash flow is shown as a positive number. Consequently, increases to cash flow are displayed as negative numbers.

|   |   | Rosin Appraisal | Barnes Appraisal |
|---|---|---|---|
| 1 | Negative cash flow per experts | 822,720 | 2,104,795 |
| 2 | Adjustment: Deferred maintenance | 750,000 | -450,000 |
| 3 | Payments or reserves required on the Effective Date | 1,266,427 | 1,266,427 |
| 4 | Adjustment:  Reimbursements by Receiver | -117,360 | -117,360 |
| 5 | Adjustment: 20% payment to Bank as Class 4 creditor | 72,000 | 72,000 |
| 6 | Interest on Bank's unsecured claim | 23,040 | 23,040 |
| 7 | Debtor proposed cram down of Bank debt @ 5% | 415,000 | 415,000 |
| 8 | Negative cash flow in first year | **3,231,827** | **3,313,902** |

Line 1 reflects the negative cash flow that each expert projected during the first year.  In light of the Court's findings regarding the appropriate estimate for deferred maintenance, Rosin underestimated deferred maintenance, and his negative cash flow must be increased, by $750,000.  Barnes overestimated deferred maintenance, and his negative cash flow must be decreased (i.e., the cash flow improved), by $450,000.  These adjustments are depicted on line 2 of the chart.

The remaining adjustments apply equally to both appraisals.  As just noted, the debtor estimated that it must actually pay or reserve $1,226,427 on the Effective Date.  (Debtor's Proposed Findings & Conclusions, at ¶ 76.)  This amount is included on Line 3.  However, I concluded that the debtor is entitled to a credit in the amount of $117,360 based on the reimbursement of real estate taxes by the Receiver.  This credit appears on Line 4.

36

Lines 5 and 6 account for adjustments to cash flow resulting from the Bank's undersecured claim. The Bank holds an unsecured claim of $360,000. The Plan calls for a 20% payment on the Effective Date to the Class 4 creditors that did not make the election to receive a one-time 40% payment. Consequently, the debtor must pay an additional $72,000 to cover the Bank's unsecured claim at that time (line 5), leaving a balance of $288,000 that the debtor would have to pay over the next two years. The debt bears interest under the Plan at 8% per annum, and the debtor would have to pay $23,040 in interest to the Bank during the first year. This amount is shown on line 6.

The last adjustment concerns the payment of interest on the Bank's secured debt. The debtor contended that the "cram down" interest rate should be prime plus 1%, or 5%. (See Debtor's Proposed Findings & Conclusions, at ¶¶ 131-32.) The Bank vehemently argued for a much higher rate, and both sides adduced expert testimony to support their positions. I need not resolve that dispute, and for the sake of argument, will assume that the debtor is right. The annual interest payable on $8.3 million at 5% is $415,000, and this is shown on line 6.

After all of these adjustments are made to the experts' appraisals, each predicts negative cash flow ranging between $3.2 million and $3.3 million during the first year after the Effective Date. Zenobio proposed to fund the Plan with an approximate $1.5 million subordinated loan, (Plan, at 18), and debtor's counsel is holding the proceeds in escrow. (See Stipulation, at ¶ 52.) This amount is plainly insufficient, and there is no evidence to support the finding that Zenobio, personally or in combination with his affiliates, has the ability or intent to more than double that investment during the first year.

37

## CONCLUSION

The Court concludes that the Plan is not feasible within the meaning of 11 U.S.C.

§ 1129(a)(11), and denies the application to confirm the Plan.  Consequently, it is

unnecessary to reach the other issues raised by the parties.

The Court also grants the Bank's pending motion to dismiss the case with

prejudice.  As set forth above, the debtor has been granted several chances during more

than three years to work out its debt problems.  It filed several plans, sought to sell the

Property when those plans fell through, abandoned the sale when the Bank became the

highest bidder, and then sought to confirm its non-consensual Plan.  Given this history

and after eight trial days, it is clear that the debtor cannot confirm a plan.  Moreover,

during the past three plus years, the debtor has lived largely expense free, paying virtually

no use and occupancy or any part of the mortgage or real estate taxes.  As a result, the

Bank has been forced to advance the real estate taxes to protect its collateral.  As this is a

two-party dispute and there does not appear to be any estate to administer, the interests of

all concerned are best served by dismissing this case, and allowing the Bank to proceed

with its foreclosure sale.

Furthermore, it is not beyond peradventure that the debtor will file another

bankruptcy to prevent the foreclosure, or transfer the Property to an entity that will then

file a petition.  Accordingly, the case is dismissed with prejudice, meaning that should the

debtor (or any successor-in-interest) file another bankruptcy case within the next 18

months, the automatic stay shall not apply to the foreclosure.  This is without prejudice to

the debtor's (or successor's) right to seek injunctive relief under the traditional standards

that apply to such applications.

Finally, the Receiver commenced an interpleader action in this Court relating to a dispute involving a security deposit, and both defendants asserted cross-claims. (See Kremer v. T.A.T. Property, Adv. Pro. No. 06-1914.) The Receiver deposited the disputed security deposit with the Clerk of the Court, and was discharged. (Order Granting Receiver Leave To Deposit Funds With Court In Connection With Interpleader Complaint, dated May 8, 2007)(the "Interpleader Order")(ECF Doc. # 32.) By order dated June 28, 2007, the Court adjourned the matter indefinitely in view of the then pending hearing on the Bank's motion to dismiss the chapter 11 case. Since then, the adversary proceeding has been dormant.

The Court declines to retain jurisdiction over the adversary proceeding. See Porges v. Gruntal & Co. (In re Porges), 44 F.3d 159, 162 (2d Cir. 1995). The lawsuit has been in a state of suspense for nearly two years. Except for the Interpleader Order, little occurred before then and nothing happened thereafter. The Receiver can commence a state court interpleader suit, deposit the fund with the state court clerk, and parties can continue their litigation without missing a beat. No general interest in promoting judicial economy would be served by my retaining jurisdiction. Furthermore, while the Bowling Green courthouse is not inconvenient, the Property, the parties and most of the lawyers are located in Long Island, and Nassau County is more convenient. Finally, dispute is non-core, involves issues of state law and does not implicate bankruptcy or other federal law. Accordingly, the Court will vacate the Interpleader Order, return the security deposit to the Receiver and dismiss the adversary proceeding. The debtor's counsel should advise the parties to that adversary proceeding of this disposition, and settle an order on notice to the parties consistent with this disposition

The foregoing constitutes the Court's findings of fact and conclusions of law.

Settle order on notice.


Dated:  New York, New York
        February 20, 2009


                                        /s/  *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        Chief United States Bankruptcy Judge